IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES L. KOSTER II, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civil Action No. 3:26-CV-0743-D |
| | § | |
| CROMWELL CAPITAL LLC, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this action by *pro se* plaintiff James L. Koster II ("Koster") seeking relief against multiple defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and Texas law, the court decides motions to dismiss filed by the following defendants: OptimumBank; Cromwell Capital, LLC ("Cromwell") and Lanny Vaysman ("Vaysman"); Fifth Third Bank, N.A. ("Fifth Third"); and Customers Bank ("Customers"). For the reasons that follow, the court grants the motions brought under Fed. R. Civ. P. 12(b)(1), dismisses Koster's federal civil RICO claims, declines to exercise supplemental jurisdiction over his state-law claims, and grants Koster leave to replead.

I

Koster is a member of JLK Benton Holdings, LLC ("JLK Benton").[1] JLK Benton,

[1]The court recounts the background facts favorably to Koster as the complaining party. This is because, for purposes of ruling on standing, the trial court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

in turn, is the sole member and sole manager of non-party CT2 Solar, LLC ("CT2").[2] Koster alleges that he funded approximately $1,425,000.00 in personal capital into CT2.

Between September and December 2024, CT2 entered into three merchant cash advance agreements ("MCAs")—two with Cromwell (the "Cromwell MCAs"), and one with defendant Lazarus Capital Funding LLC ("Lazarus")[3] (the "Lazarus MCA")—that required payment through a series of ACH withdrawals[4] from CT2's bank account. Fifth Third served as the Originating Depository Financial Institution ("ODFI") for Cromwell, and, in that

---

[2]On March 16, 2026 Koster filed a motion for authorization to appear as non-attorney representative of CT2. The court denied Koster's motion, explaining:

> The current, and longstanding, clear rule in the Fifth Circuit, which this court is obligated to follow, is "'that a corporation as a fictional legal person can only be represented by licensed counsel.'" *Donovan v. Road Rangers Country Junction, Inc.*, 736 F.2d 1004, 1005 (5th Cir. 1984) (per curiam) (quoting *K.M.A., Inc. v. Gen. Motors Acceptance Corp.*, 652 F.2d 398, 399 (5th Cir. 1982)). This rule has been applied to LLCs, which are also fictional legal persons.

Mar. 17, 2026 Order (ECF No. 14) at 1.

[3]Koster alleges in his amended complaint that The Lazarus Group LLC was formed more than four years before Lazarus Capital Funding LLC; that the December 9, 2024 MCA uses both entity names within a single parenthetical as interchangeable designations of the same contracting party; and that he has named The Lazarus Group LLC as a defendant based on its explicit identification as an alternate name for the contracting entity within the executed agreement itself. Because the distinction between the two entities is not important for purposes of the instant memorandum opinion and order, the court, for ease of reference, will refer to The Lazarus Group LLC and Lazarus Capital Funding LLC, collectively, as "Lazarus."

[4]The Cromwell MCAs required weekly ACH payments; the Lazarus MCA required daily payments.

capacity, originated 31 ACH transactions under the Cromwell MCAs. Customers served as Cromwell's exclusive banking institution for wire transactions. Cromwell directed all capital advances out through Customers and received all wire repayments into its Customers bank account. OptimumBank served as the ODFI for Lazarus. As ODFI, OptimumBank originated 37 ACH transactions under the Lazarus MCA. OptimumBank also served as Lazarus's "complete financial infrastructure," funding the advance, extracting the daily payments, and receiving the payoff under the Lazarus MCA. Am. Compl. ¶ 137.

According to the first amended complaint, all three MCAs were, in substance, usurious loans. Cromwell advanced a total of $130,248.00 in capital to CT2 and "extracted" $218,606.00 over 13 months, resulting in an overall effective annualized interest rate of 836.78%. *Id.* ¶ 56. Lazarus advanced $90,000.00 in capital to CT2 and "extracted" $142,995.05 over 51 days, resulting in an effective annualized interest rate of 12,793.16%. *Id.* ¶ 57. In addition, Cromwell and Lazarus each collected more than they were contractually owed under the MCAs, and the $65,000.00 payoff Lazarus demanded on January 30, 2025 exceeded any formula-derived balance.[5] In sum, Cromwell and Lazarus advanced $220,248.00 in net capital to CT2 and "extracted" $361,601.05 ($141,353.05 more than the capital advanced), "at effective annualized rates that are criminal under the law of every jurisdiction in which any party to [the MCAs] operates." *Id.* ¶ 61.

---

[5]The amended complaint alleges that Cromwell over-collected $25,878.31 on the first MCA and $86,113.39 on the second MCA and that Lazarus over-collected $2,225.92 on its MCA with CT2.

Koster brings the instant lawsuit against Cromwell, Lazarus, Fifth Third, Customers, OptimumBank, and various other individuals and entities[6] alleging claims under the federal RICO statute and under Texas law for usury and violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41-17.63 (West 2021). In separate motions, OptimumBank, Cromwell and Vaysman, First Third, and Customers move to dismiss Koster's amended complaint under Rules 12(b)(1), 12(b)(6), and/or 12(b)(7).[7] Koster opposes the motions, which the court is deciding on the briefs, without oral argument.

II

The court begins, as it must,[8] with the motions to dismiss under Rule 12(b)(1) for lack of standing.

A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d

[6]The following individuals and entities are also named as defendants in the amended complaint: Vaysman (the sole manager of Cromwell); World Global Capital LLC d/b/a Westwood Funding; iAdvance Now, LLC; Avanza Capital Holdings LLC; and John Does 1-10.

[7]First Third moves to dismiss under Rule 12(b)(6), but joins Cromwell and Vaysman's motion under 12(b)(1) and 12(b)(7). Customers moves to dismiss under Rules 12(b)(1) and 12(b)(6).

[8]*See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

144, 151 (5th Cir. 1998). A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See, e.g.*, *Hunter v. Branch Banking & Tr. Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When, as here, a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id*. The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id*. (citation omitted) (citing *Paterson*, 644 F.2d at 523). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

B

Defendants move to dismiss Koster's claims on the ground that he lacks Article III standing. Article III of the United States Constitution confines the jurisdiction of a federal court to an actual "case[]" or "controvers[y]." U.S. Const. art. III, § 2. The standing doctrine implements this constitutional limitation by requiring the plaintiff to establish "a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (citation and internal quotation marks omitted). To establish constitutional standing, Koster must demonstrate that he "(1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

III

The court first considers whether Koster has standing to bring his federal civil RICO claims.

A

Courts should apply a three-part test to determine whether plaintiffs individually bringing claims analogous to shareholder derivative claims[9] have satisfied general capacity requirements: (1) whether the racketeering activity was directed against the corporation; (2) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (3) whether state law provides that the sole cause of action accrues in the corporation. *Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992); *see also Joffroin v. Tufaro*, 606 F.3d 235, 238 (5th Cir. 2010). "If each of these questions

[9]Although Koster alleges that he brings this action individually and that his claims are not derivative of CT2's claims, the court's analysis in *Whalen* is instructive where, as here, the plaintiff's injuries derive from a corporate injury. *See Whalen*, 954 F.2d at 1093 ("The standing analysis used to determine when a shareholder may bring a RICO action for injuries to a corporation serves 'as a guide in determining RICO standing in closely related situations.'" (quoting *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 745 (5th Cir. 1989))); *see also Toth Enters. II, P.A. v. Forage*, 707 F.Supp.3d 697, 705 (W.D. Tex. 2023) (applying "the same three-part test used for shareholders and partners" to determine whether member of limited liability company had standing to bring individual-capacity RICO claims).

can be answered 'yes,' then the shareholders do not have the requisite standing." *Whalen*, 954 F.2d at 1091.

B

1

The court begins by identifying the object of the alleged racketeering activities. The amended complaint alleges that CT2 entered into the MCAs; that CT2 received capital under the MCAs; that the MCAs entitled defendants to a percentage of CT2's future receivables; and that the MCAs required ACH payments from CT2's bank account. Koster also alleges that CT2 "was the counterparty to both [MCAs], the entity from whose bank account Defendants withdrew $293,562.91 through ACH debits across the agreements, and from whom Defendants extracted an additional $72,495 in wire transfers during the terms of the agreements." Am. Compl. ¶ 20. Koster does not allege any facts that show that defendants directed any racketeering activity at him or that they had a "direct intent to injure" him. *See Joffroin*, 606 F.3d at 238 ("Appellants do not allege that Appellees 'committed any fraudulent acts with the *direct* intent to injure' Appellants."). Instead, he clearly alleges that the racketeering activities were directed against CT2. *See, e.g.*, *In re Sorrento Therapeutics, Inc.*, 2026 WL 1791033, at *22 (Bankr. S.D. Tex. June 22, 2026) (plaintiffs lacked standing to bring RICO claim where, *inter alia*, racketeering activity was directed against the corporation, plaintiffs did not allege they were directly targeted or that "the harms they suffered affected themselves distinctly in comparison to the [corporation]," and plaintiffs did not allege defendants stole property from them individually "but rather they stole

[company's] property, and [plaintiffs'] stock value diminished as a result.").

2

The court next turns to the scope of the injury. In his response briefs, Koster contends that he has pleaded three direct, personal injuries: (1) the enterprise required him to execute a personal guarantee in his own name as a condition of the Lazarus advance, which created a direct, personal obligation running from Koster to the enterprise; (2) he personally funded CT2's operations, and every dollar that the enterprise extracted came from that personal capital; and (3) on March 11, 2026, after he filed this suit, the enterprise sent him a demand letter and related communications seeking payment and threatening enforcement against his personal and business accounts.

As a preliminary matter, Koster cannot rely on the March 11, 2026 demand letter to establish a "personal injury" for purposes of his RICO claims. As this court has repeatedly held, under the Rule 12(b)(6) standard that governs a facial attack on subject matter jurisdiction, "[w]hen ruling on a motion to dismiss, the court does not consider additional facts that are alleged in a response brief but not in the complaint." *Purdin v. Wells Fargo Bank, N.A.*, 2016 WL 1161808, at *3 (N.D. Tex. Mar. 23, 2016) (Fitzwater, J.) (citing *Leal v. McHugh*, 731 F.3d 405, 407 n.2 (5th Cir. 2013)). Koster has not included any allegations regarding the March 11, 2026 demand letter in his amended complaint.

With respect to the other "personal injuries," Koster has not alleged any facts that demonstrate an injury that is independent, and not derivative, of the alleged injury to CT2. He pleads that he "personally funded approximately $1,425,000 in personal capital into CT2

as its sole capital source," and that the RICO enterprise extracted $361,601.05 "from CT2's accounts . . . each dollar of which was a dollar of Koster's personal investment." Am. Compl. ¶ 174. The "extraction" of funds, however, is an injury to CT2. As Koster alleges, the RICO enterprise "drained the operating capital of a small business that Koster had funded . . . impairing CT2's ability to meet its obligations, maintain its operations, and preserve its value as a going concern." *Id.* ¶ 175. In other words, the operating capital that defendants allegedly "drained" belonged to CT2, not to Koster. *See, e.g.*, *Flores v. Koster*, 2014 WL 1243676, at *6 (N.D. Tex. Feb. 28, 2014) (Ramirez, J.) ("[W]hen plaintiff Clarkson provided the investment funding on behalf of Mockingbird for the profit sharing agreement, she transferred the funds to Mockingbird. Thus, any injury derived from the investment is Mockingbird's property. Plaintiffs as individuals do not have a right to Mockingbird's property and no right to sue on Mockingbird's injury."), *rec adopted*, 2014 WL 1243676 (N.D. Tex. Mar. 25, 2014) (Lynn, J.).[10]

Nor does Koster's allegation that he "execute[d] personal guaranties holding him liable for the entity's obligations" allege an individual injury. Am. Compl. ¶ 18. "The general rule in Texas is that 'guarantors do not have standing to bring claims for breach of

---

[10]To the extent that Koster alleges he has been harmed by the diminution in value of his ownership interest in CT2, "including the loss of equity value attributable to Koster's personal investment," Am. Compl. ¶ 174, this too is an allegation of derivative harm. *See, e.g.*, *United States v. Acadiana Treatment Sys. Inc.*, 214 F.3d 1350 (5th Cir. 2000) (unpublished table decision) ("[I]n general, 'diminution in value of the corporate assets is insufficient direct harm to give the shareholder standing . . . in his own right.'" (ellipses in original) (quoting *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981) (per curiam))).

contract on behalf of the principal debtor.'" *DT Apartment Grp., LP v. CWCapital, LLC*, 2012 WL 6693192, at *27 (N.D. Tex. Dec. 26, 2012) (Fitzwater, C.J.) (quoting *Compass Bank v. Veytia*, 2011 WL 6046530, at *3 (W.D. Tex. Dec. 5, 2011)).[11] And this court has held that "[w]here a plaintiff is both a shareholder and a guarantor, he lacks standing to sue in a personal capacity where the claim belongs to the corporation." *Id.* (citing cases); *see also White v. Romspen Mortg. Ltd. P'ship*, 2022 WL 19573111, at *9 (W.D. Tex. Dec. 7, 2022) (same), *rec. adopted*, 2023 WL 3089982 (W.D. Tex. Jan. 17, 2023). Koster's RICO claims are not premised on any conduct related to the personal guaranties. In fact, he does not allege any guarantee-based injury at all.[12] Instead, as explained above, Koster's alleged injuries "derive[] from, and thus [are] not distinct from, the injury to [CT2]." *Whalen*, 954 F.2d at 1091; *see also, e.g.*, *DT Apartment Grp., LP*, 2012 WL 6693192, at *27 ("Because [plaintiff] is a guarantor and has not stated how any one or more of the generally alleged injuries are personal to him, the court holds that he lacks standing.").

---

[11]Although the court does not address in this memorandum opinion and order whether Koster has standing to bring his state-law claims, it does note that, "[a]s a matter of Texas law, a guarantor does not have standing to assert a usury cause of action." *Bair Chase Prop. Co. v. S & K Dev. Co.*, 260 S.W.3d 133, 145 (Tex. App. 2008, pet. denied) (citing *El Paso Refining, Inc. v. Scurlock Permian Corp.*, 77 S.W.3d 374, 384 (Tex. App. 2002, pet. denied)).

[12]To the extent that Koster argues that he has suffered a concrete, particularized injury due to his "[e]xposure under a guaranty," P. Br. (ECF No. 35) at 6, the Supreme Court has held that in a suit for damages, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm" for purposes of Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021).

3

Third, the court applies the relevant state law. Under Texas law, "[a] limited liability company is considered a separate legal entity from its members." *Barrera v. Cherer*, 2014 WL 1713522, at *2 (Tex. App. Apr. 30, 2014, no pet.) (citing *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 109 (Tex. App. 2011, pet. denied); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App. 2008, no pet.)). And a member of a limited liability company—even the sole member—does not have standing to sue personally for injuries to the company. *See In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 507-08 (N.D. Tex. 2019) (Fitzwater, J.) (under Texas and federal law, "only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation. Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships . . . [and] limited liability companies" (citations omitted)), *aff'd*, 850 Fed. Appx. 302 (5th Cir. 2021); *see also Schoen v. Underwood*, 2012 WL 13029591, at *5 (W.D. Tex. May 15, 2012) ("A member of an L.L.C. cannot recover damages for injuries suffered by the company, even though she may have been indirectly injured by the decrease in value of her membership interest. To sue on the L.L.C.'s behalf, the member must bring a derivative suit. Otherwise, she must establish a personal cause of action and a personal injury."); *Barrera*, 2014 WL 1713522, at *2 ("A member of a limited liability company lacks standing to assert claims individually where the cause of action belongs to the company.").

Accordingly, because each *Whalen* factor can easily be answered"yes," the court holds that Koster does not have standing to assert his RICO claims. *Whalen*, 954 F.2d at

1091.

C

In his response briefs, Koster contends, apparently in the alternative, that he has standing to bring his RICO and other claims in this lawsuit because CT2 assigned him its affirmative rights and claims by a written instrument executed on May 19, 2026. This argument lacks merit.

As stated above, the court assesses a facial challenge to subject matter jurisdiction as it does a Rule 12(b)(6) motion, looking only at the sufficiency of the allegations in the operative pleading and assuming them to be true. *Hunter*, 2013 WL 607151, at *2 (citing *Paterson*, 644 F.2d at 523). The court does not consider additional facts that are alleged in a response brief but not in the complaint. *See Purdin*, 2016 WL 1161808, at *3 (citing *Leal*, 731 F.3d at 407 n.2). Although Koster has filed with the court a notice of assignment, he has not included any allegations regarding the May 19, 2026 assignment in his amended complaint. And in deciding defendants' motions to dismiss, the court declines to consider factual allegations that are not contained in the amended complaint itself.

Moreover, even if the court *did* consider CT2's purported assignment of claims, "standing is . . . determined as of the commencement of the suit." *In re Isbell Recs., Inc.*, 774 F.3d 859, 869-70 (5th Cir. 2014) (alteration in original) (quoting *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 458 (5th Cir. 2005)). "Though a plaintiff may later amend [his] complaint, post-filing events generally cannot cure a jurisdictional defect that existed at the time the original complaint was filed." *Johnson v. Lane*, 774 F.Supp.3d 824, 830-31 (N.D.

Tex. 2024) (Horan, J.) (citing *Camsoft Data Sys., Inc. v. S. Elec. Supply, Inc*., 756 F.3d 327, 337 (5th Cir. 2014)), *rec. adopted*, 774 F.Supp.3d 824 (N.D. Tex. 2024) (Brown, J.); *see also Arena v. Graybar Elec. Co*, 669 F.3d 214, 218 (5th Cir. 2012) ("Although 28 U.S.C. § 1653 and [Rule] 15(a) allow amendments to cure defective jurisdictional allegations, these rules do not permit the creation of jurisdiction when none existed at the time the original complaint was filed."). The purported assignment of claims on May 19, 2026 post-dates the filing of this action, and, as such, cannot confer standing on Koster. *See, e.g.*, *Epic Sporting Goods, Inc. v. Fungoman LLC*, 2011 WL 588496, at *4 (W.D. La. Feb. 10, 2011) ("[Plaintiff] lacked . . . standing under Article III of the Constitution . . . at the inception of this lawsuit, and such a defect . . . can be cured neither by a subsequent assignment nor a subsequent amendment of the pleadings.").[13]

---

[13]The court also notes that the federal statute governing appearances in federal court permits an individual to proceed *pro se*, but does not authorize a *pro se* individual to appear on behalf of a corporation. 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."). "In light of [the] policy reasons for preventing a lay person from representing a corporation in litigation, the federal courts have, in cases governed by federal law, disapproved any circumvention of the rule by the procedural device of an assignment of the corporation's claims to the lay individual." *Stark v. Kohrs*, 2020 WL 734480, at *3 (W.D. Tex. Feb. 12, 2020) (quoting *Jones v. Niagara Frontier Transp. Auth*., 722 F.2d 20, 23 (2d Cir. 1983)). "Courts faced with this question routinely hold that an individual who has been assigned claims from a corporation cannot proceed pro se." *Id*. (collecting cases). This means that even if CT2 validly assigns its claims to Koster, it is unlikely that Koster would be able to pursue those claims without first obtaining counsel.

IV

The court now considers whether it should exercise supplemental jurisdiction over Koster's state-law claims given that it is dismissing his federal-law claims.[14]

Although the court can exercise supplemental jurisdiction over Koster's state-law claims under 28 U.S.C. § 1367(a), in this circuit "[t]he general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial[.]" *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009). Accordingly, the court in its discretion declines to exercise supplemental jurisdiction over Koster's state-law claims and dismisses them without prejudice. *See ER Addison, LLC v. Aetna Health Inc.*, 2025 WL 1869591, at *3 (N.D. Tex. July 3, 2025) (Fitzwater, J.).

V

Although the court is granting defendants' motions to dismiss, it will grant Koster leave to replead. *See, e.g.*, *In re Am. Airlines, Inc., Priv. Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (noting that district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing case, unless it is clear that defects are incurable or plaintiffs advise court that they are unwilling or unable to amend in a manner

[14]Having dismissed Koster's federal-law claims, the court may still possess original jurisdiction over his state-law claims under 28 U.S.C. § 1332. But Koster does not allege facts that enable the court to reasonably infer that he is a completely diverse citizen from every defendant. *See Boone v. Wilson*, 2018 WL 9988322, at *1 (N.D. Tex. Aug. 27, 2018) (Fitzwater, J.).

that will avoid dismissal). The defects in Koster's first amended complaint are not clearly incurable, and he has not demonstrated that he is unwilling to cure the defects that the court has identified. To the contrary, he explicitly requests leave to amend if the court "conclude[s] that any aspect of the Complaint or of CT2's status requires procedural clarification." P. Br. (ECF No. 35) at 24. Moreover, as a *pro se* plaintiff, Koster should be given a fair opportunity to plead his best case. *See, e.g.*, *Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2004 WL 789870, at *1 (N.D. Tex. Apr. 12, 2004) (Fitzwater, J.) ("Although the court granted Merrill Lynch's motion to dismiss, it gave Robinette one more opportunity to plead his best case, because he was proceeding pro se."). Accordingly, the court will grant Koster 28 days from the date this memorandum opinion and order is filed to file a second amended complaint.

* * *

For the reasons explained, the court dismisses Koster's federal RICO claims under Rule 12(b)(1), declines to exercise supplemental jurisdiction over his state-law claims, and grants Koster leave to replead. OptimumBank's May 4, 2026 motion to dismiss complaint pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7) is granted in part; Cromwell and Vaysman's May 6, 2026 motion to dismiss plaintiff's first amended complaint is granted in

part; Fifth Third's May 15, 2026 motion to dismiss plaintiff's first amended complaint is granted in part; and Customers' July 17, 2026 motion to dismiss plaintiff's first amended complaint is granted in part.

**SO ORDERED**.

September 25, 2026.

SIDNEY A. FITZWATER
SENIOR JUDGE